IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Joshua T. Priest, | ) | C/A No.: 1:15-1206-MGL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claims for Supplemental Security Income ("SSI") and Child's Insurance Benefits ("CIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

A.      Procedural History

On March 28, 2012, Plaintiff protectively filed an application for SSI in which he alleged his disability began on March 24, 1994. Tr. at 61, 179–84. Plaintiff subsequently

filed an application for CIB on October 16, 2013. Tr. at 196–98. His applications were denied initially and upon reconsideration. Tr. at 64–67, 68–69. On December 3, 2013, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Roseanne P. Gudzan. Tr. at 29–59 (Hr'g Tr.). The ALJ issued an unfavorable decision on January 21, 2014, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 7–28. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 13, 2015. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 19 years old at the time of the hearing. Tr. at 34. He completed twelve years of public education and obtained a district occupational credential. Tr. at 42, 322. He has no past relevant work. Tr. at 57. He alleges he has never been able to work. Tr. at 179.

2.    Medical History

Barbara Mason, Ed. S. ("Ms. Mason"), saw Plaintiff for a psychological evaluation on February 7, 2006 (age 11 years, 10 months). Tr. at 335. She indicated Plaintiff had last been evaluated on January 19, 2003 (age 8 years, 9 months), and obtained the following scores on the third edition of the Wechsler Intelligence Scale for Children ("WISC-III"): verbal intelligence quotient ("IQ") of 59; performance IQ of 62; and full-scale IQ of 56. Tr. at 335. She stated Plaintiff's test scores were in the mild

mentally disabled range. *Id.* She indicated Plaintiff was in a self-contained classroom and had difficulty with socialization. Tr. at 336.

Ms. Mason observed Plaintiff in a classroom setting and noted the following abnormalities: needed instructions repeated; distracted by noise, color, movement, and activity; displayed a short attention span; fidgeted, was restless, and did not sit still; manipulated objects on desk, clothing, etc.; failed to remain in seat; became overly excited and overstimulated; had difficulty delaying gratification; daydreamed and seemed preoccupied or withdrawn; failed to follow directions; failed to complete work independently; provided responses that were irrelevant to the task at hand; had difficulty remembering lessons from one day to the next; needed repeated or lengthy attempts to remember new information; lost or failed to complete assignments; was repeatedly late for class; had difficulty beginning tasks; had difficulty applying phonetic rules to sound out words; had difficulty applying subskills to a whole task; became stubborn, uncooperative and resistant to completing assigned work; engaged in silly, immature, and attention-getting behavior; responded impulsively with no attention to accuracy or details; made careless errors and omitted information from work; repeatedly made identical errors; demonstrated poor handwriting; had difficulty copying information; paused and searched for appropriate words and had difficulty sequencing words when speaking; and demonstrated difficulty responding to non-verbal cues, gestures, and facial expressions. Tr. at 336–37.

Ms. Mason administered the fourth edition of the Wechsler Intelligence Scale for Children ("WISC-IV") and assessed the following scores: 67 on verbal comprehension

index ("VCI"); 47 on perceptual reasoning index ("PRI"); 62 on working memory index ("WMI"); and 73 on processing speed index ("PSI"). Tr. at 338. Plaintiff had a full scale IQ score of either 53 or 63.[1] Tr. at 338. Ms. Mason noted discrepancies between Plaintiff's VCI and PRI scores and explained that Plaintiff may have more difficulty processing and understanding materials presented visually than those presented orally. *Id.* She stated Plaintiff had difficulty understanding social situations and may react impulsively. *Id.* Ms. Mason also administered the Kaufman Test of Educational Achievement, Second Edition, and Plaintiff scored in the moderate mentally disabled range in math concepts and applications and in the mild mentally disabled range in listening comprehension. Tr. at 338–39. Ms. Mason indicated Plaintiff had difficulty with simple addition and subtraction and was only able to read the words "on," "it," and "apple" on the word recognition portion of the test. Tr. at 339. Plaintiff's scores on the Behavior Assessment for Children ("BASC") scale showed him to be at-risk for hyperactivity, aggression, attention problems, and study skills. Tr. at 339–40. Dr. Rabon, a special education teacher, administered the Vineland Adaptive Behavior Scales ("VABS") interview to Plaintiff's grandmother to assess his communication, daily living, and socialization skills. Tr. at 340. Based on his grandmother's report, Plaintiff's scores ranged from the mild mentally disabled range in socialization skills to the borderline range in communication and daily living skills. *Id.* Ms. Mason concluded that Plaintiff

---

[1] The testing indicates a full scale IQ of 53 in one place and a full scale IQ of 63 in another place. *See* Tr. at 338. It is unclear from the record which of these scores was correct.

had a mild mental disability and would best be served in a classroom that would work on functional living skills and academics. Tr. at 341.

Plaintiff presented to Edward C. Holscher, M.D. ("Dr. Holscher"), on June 7, 2011, for mental health treatment. Tr. at 346–47. He reported that his sleep and focus were okay and that his peer conflicts had ended. Tr. at 346. He stated that he did not know if he would pass his classes. *Id.* Plaintiff's symptoms targeted for treatment included hyperactivity, inattentiveness, hyperverbal response, oppositional behavior, and sleep and appetite disturbance. *Id.* A mental status examination was normal. *Id.* Dr. Holscher assessed attention deficit hyperactivity disorder ("ADHD"). *Id.*

On October 12, 2011, Plaintiff indicated to Dr. Holscher that he was in eleventh grade and that his grades and mood were okay on his medications. Tr. at 348. A mental status examination was normal. *Id.* The treatment note indicated Plaintiff had been prescribed Depakote for seizures in the past, but that it had been discontinued because he had experienced no seizures since 2002. Tr. at 349.

On February 10, 2012, Plaintiff reported to Dr. Holscher that he was taking his medications. Tr. at 350. He stated he was having problems with irritability at home, but was experiencing no conflicts at school, aside from being teased by his peers. Tr. at 350–51. *Id.* A mental status examination was normal. Tr. at 350.

Plaintiff presented to consultative psychologist Douglas R. Ritz, Ph. D. ("Dr. Ritz"), for a psychological evaluation on May 25, 2012. Tr. at 389–92. Plaintiff's mother ("Ms. Dollard") reported that he did not do chores and that she had to make him take care of his personal grooming. Tr. at 390. Plaintiff indicated he had no friends. *Id.* Dr. Ritz

observed that Plaintiff had a body odor. *Id.* Plaintiff admitted that he had not taken Vyvanse on the day of the evaluation or Risperdal on the prior night. *Id.* Dr. Ritz indicated Plaintiff demonstrated poor effort on testing and that the test results were not an accurate estimate of his cognitive or academic functioning. *Id.* Dr. Ritz indicated the evidence suggested Plaintiff was "at least minimizing if not malingering during this assessment." Tr. at 392. He stated Plaintiff likely had significant learning deficits, but that they could not adequately be assessed during the evaluation. *Id.*

State agency consultant Lisa Clausen, Ph. D. ("Dr. Clausen"), reviewed the record and completed a psychiatric review technique form ("PRTF") on June 1, 2012. Tr. at 396–409. She considered Listings 12.04 for affective disorders and 12.05 for mental retardation. Tr. at 396. She found that Plaintiff had ADHD and a learning disability, not otherwise specified. Tr. at 399, 400. Dr. Clausen indicated that the record contained insufficient evidence for her to assess Plaintiff's degree of functional limitation. Tr. at 406.

On July 30, 2012, Plaintiff reported to Dr. Holscher that he would be entering the twelfth grade and was on the football team. Tr. at 413. A mental status examination was normal. *Id.*

State agency consultant Judith Von, Ph. D. ("Dr. Von"), reviewed the record and completed a PRTF on October 24, 2012. Tr. at 417–30. She considered Listing 12.02 for organic mental disorders. Tr. at 417. She found that Plaintiff had ADHD and a learning disorder. Tr. at 418. She indicated Plaintiff had no restriction of activities of daily living and moderate difficulties in maintaining social functioning and concentration,

persistence, or pace. Tr. at 427. Dr. Von also completed a mental residual functional capacity ("RFC") assessment and found that Plaintiff had moderate limitations in the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Tr. at 431–33.

On February 14, 2013, Plaintiff presented to Philip Sinato, Jr., M.D. ("Dr. Sinato"), for mental health treatment. Tr. at 436–37. After some discussion, Plaintiff revealed to Dr. Sinato that he had not been taking his medications. Tr. at 436. He complained that Vyvanse caused stomach upset. *Id.* He indicated that he was not doing well in school and had been suspended 15 to 20 times during the current school year. *Id.* Plaintiff reported anger issues, and Dr. Sinato noted that Plaintiff was distracted by his cell phone during the interview. *Id.* Dr. Sinato indicated Plaintiff made poor eye contact and seemed to lack motivation. *Id.* He assessed Plaintiff to have poor judgment and insight. Tr. at 437. He prescribed Risperdal and Concerta. *Id.*

Plaintiff and Ms. Dollard followed up with Dr. Sinato on May 22, 2013. Tr. at 439–41. Ms. Dollard reported that Concerta was working better than Vyvanse, but that Plaintiff had a grand mal seizure after starting the new medication. Tr. at 439. She stated Plaintiff had not seen a neurologist in several years. *Id.* She indicated Plaintiff continued to experience "very bad mood swings" and to be quickly angered. *Id.* Dr. Sinato observed that Plaintiff appeared disinterested and had limited judgment and insight. Tr. at 440. He

7

discontinued Concerta because it could precipitate seizures and prescribed Strattera. Tr. at 439. He prescribed Valproate for seizures and advised Ms. Dollard to schedule Plaintiff for an appointment with a neurologist. Tr. at 441.

On August 28, 2013, Ms. Dollard reported to Marc Weinbaum, M.D. ("Dr. Weinbaum"), that Plaintiff was doing well and was less distracted than he had been without medication. Tr. at 442. Plaintiff indicated that he was sleeping well and had an adequate appetite. *Id.* Dr. Weinbaum described Plaintiff as "minimally participating" and "fidgety." He stated Plaintiff's cognition was fair, but that he was "still distractible" and did not want to be there. *Id.* He stated Plaintiff's judgment was improving, but that his insight was limited. Tr. at 443. He indicated Plaintiff had sleep-related hallucinations and that his thought process was distractible. *Id.*

### 3. Education Records

The record contains multiple disciplinary reports for the period from October 14, 2009, to November 10, 2011 (ages 15 to 17). Tr. at 215–16. Plaintiff engaged in improper conduct that included threatening to fight other students; using profane language; possessing a weapon; being tardy on an excessive basis; using his cell phone in class; standing and walking while his school bus was in motion; throwing objects; cutting class; disrupting class; and being disrespectful to his teachers, peers, and bus driver. *Id.*

A May 12, 2011 (age 17), individualized education program ("IEP") plan indicates that Plaintiff received a below basic score in reading. Tr. at 325. His teachers indicated he had difficulty blending sounds to make words and recalling details. *Id.* Plaintiff could write in complete simple sentences, but spelled words incorrectly. *Id.* He struggled with

an introduction and basic details when writing a simple paragraph and was unable to write complex or compound sentences. *Id.* He obtained a below basic score in math. *Id.* He could add without regrouping, but was unable to multiply. *Id.* Plaintiff's daily living skills were indicated to be commensurate with those of his peers. *Id.*

A behavioral intervention plan dated March 28, 2012 (age 18), indicated Plaintiff was fighting on the bus between the vocational center and the high school. Tr. at 373. To address the problem, Plaintiff was to be separated from the other students and monitored while on the bus. *Id.*

An IEP plan dated April 26, 2012, indicated Plaintiff was enrolled in the eleventh grade and performed more efficiently in Junior Reserve Officers' Training Corps ("JROTC") and vocational classes. Tr. at 361. It indicated Plaintiff's math and reading scores had improved slightly. *Id.* Plaintiff scored on a first grade level in language arts on Measure of Academic Progress ("MAP") testing. *Id.* He was able to read two-syllable words fluently with 60 percent understanding. *Id.* He continued to struggle with spelling, complex sentences, and basic paragraph construction. *Id.* Plaintiff also scored on a first grade level on the math portion of the MAP test. *Id.* He demonstrated an extremely aggressive temper and attitude. *Id.* He showed little respect for adults and authority. *Id.* He was very susceptible to peer pressure and easily distracted. *Id.* He often forgot manners and values toward others. *Id.* However, Plaintiff's daily living skills were described as commensurate with those of his peers. *Id.*

On May 4, 2012, Plaintiff's teacher Daniel McNair ("Mr. McNair") completed a questionnaire regarding Plaintiff's functioning. Tr. at 260–67. He indicated that he spent

three hours per day with Plaintiff and taught him math and English. Tr. at 260. Mr. McNair indicated Plaintiff functioned on a first grade level in reading, writing, and math. *Id.* He considered Plaintiff's abilities to acquire and use information and indicated he had serious problems comprehending and doing math problems and expressing ideas in written form and obvious problems understanding school and content vocabulary, reading and comprehending written material, understanding and participating in class discussions, providing organized oral explanations and adequate descriptions, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions. Tr. at 261. Mr. McNair specified that Plaintiff could not spell words correctly, write a complete sentence, or perform simple addition and subtraction. *Id.* He considered Plaintiff's abilities to attend and complete tasks and indicated he had serious problems focusing for long enough to finish assigned activities or tasks, completing classwork and homework assignments, completing work accurately without careless mistakes, and working without distracting himself or others. Tr. at 262. He described Plaintiff as having obvious problems carrying out simple and multi-step instructions, waiting to take turns, changing from one activity to another without being disruptive, and working at a reasonable pace/finishing on time. *Id.* He indicated these problems occurred on an hourly basis. *Id.* Mr. McNair considered Plaintiff's abilities to interact and relate with others and indicated he had an obvious problem expressing anger appropriately, following rules, respecting and obeying adults in authority, and taking turns in a conversation. Tr. at 263. He indicated Plaintiff could become very aggressive and liked to please his peers with negative behavior. *Id.* He considered Plaintiff's abilities to move

about and manipulate objects and found that Plaintiff had obvious problems with respect to his ability to move his body from one place to another and his ability to move and manipulate things. Tr. at 264. However, he noted that Plaintiff was playing football and stated that "may give you a since [sic] of his motor skills." *Id.* Mr. McNair considered Plaintiff's ability to engage in self-care and indicated Plaintiff had a serious problem using appropriate coping skills to meet daily demands of the school environment and obvious problems handling frustration appropriately, being patient when necessary, and cooperating in or being responsible for taking his needed medications. Tr. at 265. He noted that Plaintiff had very good or excellent personal hygiene and dressed very well. *Id.* He indicated Plaintiff took his medication regularly, but noted that he could "become a major problem" without medication. Tr. at 266.

An IEP plan from May 2012 indicated Plaintiff expressed an interest in carpentry and that his post-secondary goal was to obtain a job with a construction crew and receive on-the-job training. Tr. at 320. The IEP plan reflected that Plaintiff was to receive a district occupational credential instead of a high school diploma. Tr. at 322.

Mr. McNair completed a second questionnaire on September 18, 2012. Tr. at 295–302. He indicated Plaintiff was reading and performing math on a first grade level and writing on a second grade level. Tr. at 295. He assessed Plaintiff as having obvious problems acquiring and using information and attending and completing tasks. Tr. at 296, 297. He indicated Plaintiff had obvious problems interacting and relating with others in most activities and required a behavioral intervention plan. Tr. at 298. He noted Plaintiff had some difficulty communicating orally when the topic of conversation was unknown.

Tr. at 299. He stated Plaintiff had obvious problems moving about and manipulating objects. Tr. at 299. He indicated Plaintiff had obvious problems handling frustration appropriately and being patient when necessary, but had only slight problems in most areas of self-care. Tr. at 300.

4.    Function Reports

An unsigned function report dated April 2, 2012, indicated Plaintiff had some vision problems, but had not yet been prescribed glasses. Tr. at 228. The individual[2] who completed the report stated Plaintiff had problems talking clearly, but could be understood by those who knew him most of the time and by those who did not know him some of the time. Tr. at 229. She indicated Plaintiff was unable to perform the following communication-related abilities: answer the telephone and make telephone calls; deliver phone messages; tell jokes or riddles accurately; explain why he did something; use sentences with "because," "what if," or "should have been"; ask for what he needs; talk with family; and talk with friends. Tr. at 230. She stated Plaintiff was unable to read and understand comics and cartoons; read and understand stories in books, magazines, or newspapers; tell time; multiply and divide numbers over 10; and understand money or make correct change. Tr. at 231. She indicated Plaintiff was limited in his abilities to ride a bike, run, dance, jump rope, play sports, and drive a car. *Id.* She stated Plaintiff did not have friends his own age; had difficulty making new friends; and did not play team

---

[2] Plaintiff alleges this report was completed by Debbie Blake. [ECF No. 16 at 5]. The next report in the record identifies Debbie Blake as the representative from the Social Security Administration ("SSA") who conducted the interview. *See* Tr. at 237. Because Ms. Dollard filed the application on Plaintiff's behalf, it is likely that she provided the information in the function report. *See* Tr. at 63.

sports. Tr. at 232. She indicated Plaintiff was limited in his abilities to take care of his personal needs and safety: to take care of personal hygiene (keeping clean, brushing teeth, combing hair); to wash and put away his clothes; to help with chores around the house; to prepare his own meals; to study and do homework; to take needed medication; to use public transportation; to accept criticism or correction; to avoid accidents; and to ask for help when needed. Tr. at 233. She indicated Plaintiff had difficulty paying attention and remaining on task to complete homework and chores on time. Tr. at 234.

Ms. Dollard completed an adult function report on April 14, 2012. Tr. at 247–57. She indicated Plaintiff's ability to work was limited by his short attention span, seizure activity, and drowsiness caused by his medications. Tr. at 247. She stated she woke Plaintiff each morning, administered his medications, and stayed with him while he waited for his bus to arrive. Tr. at 250. She indicated she had to prompt Plaintiff to bathe, brush his teeth, and fix his hair. Tr. at 250–51. She stated Plaintiff was not allowed to use the stove, but could heat a sandwich in the microwave. Tr. at 251. She indicated Plaintiff sometimes made his bed after being reminded to do so many times, but did not do yard work because of an inability to use equipment and follow directions. Tr. at 251–52. She stated Plaintiff watched television, played basketball, and attended school and church. Tr. at 253. Ms. Dollard indicated Plaintiff had difficulty walking, lifting, bending, completing tasks, concentrating, understanding, following instructions, and getting along with others. Tr. at 254. She stated Plaintiff preferred to be by himself. Tr. at 255. She indicated Plaintiff had difficulty handling stress and responding to changes in routine. Tr. at 256.

Ms. Dollard completed another function report on July 3, 2012. Tr. at 280–91. She indicated Plaintiff had unpredictable seizures. Tr. at 280. She stated Plaintiff experienced nightmares and engaged in sleepwalking. Tr. at 265. She indicated Plaintiff resisted changing clothes and bathing on a daily basis and made a mess when eating and using the toilet. *Id.* She stated Plaintiff was unable to administer his own medications or to prepare his own meals. Tr. at 266. She indicated Plaintiff sometimes assisted her in raking leaves, but only if she stayed in the yard with him. *Id.* She stated she did not allow Plaintiff to go places alone because of his vulnerability. Tr. at 267. She indicated Plaintiff was incapable of handling money or paying bills. *Id.*

 C.  The Administrative Proceedings

  1.  The Administrative Hearing

   a.  Plaintiff's Testimony

At the hearing on December 3, 2013, Plaintiff testified that he graduated from high school in 2013. Tr. at 34. He denied having a driver's license and stated that he had not attempted to obtain one because of his seizures. Tr. at 34–35. He testified that he had seizures nearly every day. Tr. at 35. He stated his seizures were associated with flickering lights and video game playing. Tr. at 35–36. However, he indicated that he played video games nearly all night long and slept during the day. Tr. at 36, 38. The ALJ asked Plaintiff why he continued to play video games when he knew they made his seizures worse. Tr. at 38. He responded that he liked to play video games. *Id.*

Plaintiff testified that he assisted the football team while he was in school, but he denied being on the team. Tr. at 36. He stated he carried the team's equipment. *Id.* He indicated he did not participate in any other sports or activities while he was in school. *Id.*

Plaintiff stated he lived with his mother and had always lived with her. Tr. at 37. He denied assisting with chores or housework. *Id.* He indicated he could clean his room if his mother told him how to do so, but that his mother would have to remain in the room to make sure that he completed the task. *Id.* He stated that his mother typically drove him, but indicated he had traveled to school by bus. Tr. at 38–39. He testified that his mother administered his medications. Tr. at 39. He stated he was able to shower and brush his teeth. Tr. at 40. He indicated his mother purchased his clothes. Tr. at 40.

b.     Witness Testimony

Ms. Dollard testified at the hearing. Tr. at 41. She indicated Plaintiff received a certificate of attendance in April because he aged out of services. Tr. at 42–43. She stated Plaintiff was in special education classes for 14 years. Tr. at 43.

Ms. Dollard testified that Plaintiff had been approved for SSI as a child because of seizures, ADHD, a chemical imbalance, and IQ problems. *Id.* She indicated that Plaintiff had problems understanding things and often required that information be repeated. Tr. at 43–44. She stated Plaintiff could read on a second grade level and do simple arithmetic. Tr. at 44. She testified that she had to repeatedly instruct Plaintiff to perform tasks and to sit with him until he performed them. Tr. at 44–45. She stated Plaintiff was easily frustrated and often would not even try to complete tasks. Tr. at 45.

Ms. Dollard indicated Plaintiff's last seizure occurred one month earlier. Tr. at 47. She stated she took Plaintiff to the hospital and that he was referred to a neurologist. *Id.* She indicated Plaintiff would typically wet himself during seizures. Tr. at 48. She stated Plaintiff was prescribed Concerta for ADHD, but that Concerta was discontinued and Strattera was prescribed after Plaintiff began to experience more frequent seizures. Tr. at 48–49. She denied that Plaintiff stayed up all night playing video games and indicated he did not experience daily seizures. Tr. at 51.

Ms. Dollard testified that Plaintiff had difficulty cleaning himself. Tr. at 45–46. She stated Plaintiff was unable to handle monetary transactions and could not make change. Tr. at 46. She indicated Plaintiff made his bed "in his way." Tr. at 49. She stated Plaintiff could vacuum the floor, but failed to pick up items to vacuum under them. Tr. at 49–50. She indicated Plaintiff could prepare a peanut butter and jelly sandwich, but was unable to use the stove to cook. Tr. at 51. She stated Plaintiff was no longer able to use the microwave because he had damaged the microwave by heating food that was wrapped in aluminum foil. Tr. at 52. She indicated Plaintiff sometimes accompanied her on trips to Wal-Mart and to visit family in Georgetown, but spent most of his time at home. Tr. at 52–53. She stated Plaintiff did not regularly visit with friends. Tr. at 53.

c.    Vocational Expert Testimony

Vocational Expert ("VE") Arthur F. Schmitt, Ph. D., reviewed the record and testified at the hearing. Tr. at 57–58. The ALJ described a hypothetical individual of Plaintiff's vocational profile who should never climb ladders, ropes, or scaffolds; should never balance for safety on dangerous surfaces, drive, or work around hazards such as

16

unprotected heights and dangerous machinery and parts; could understand, remember, and carry out simple, routine, repetitive tasks for two hours at a time; could adapt to changes in a routine work setting that were infrequent and introduced gradually; could make simple work-related decisions; could occasionally interact with coworkers, supervisors, and the public; could never work around crowds or in coordination with others; and should have production demands that consist of having assigned tasks to complete by the end of a workday or shift. Tr. at 57–58. The ALJ asked whether there were any jobs in the regional or national economy that the hypothetical person could perform. Tr. at 58. The VE identified medium jobs with a specific vocational preparation ("SVP") of two as an egg packer, *Dictionary of Occupational Titles* ("*DOT*") number 920.687-134, with 1,982 positions in South Carolina and 360,000 positions nationally; a janitorial laborer, *DOT* number 381.687-018, with 27,600 positions in South Carolina and 2,090,000 positions nationally; and a laundry operator, *DOT* number 361.685-010, with 3,190 positions in South Carolina and 211,000 positions nationally. *Id.*

The ALJ asked the VE to assume the individual could not maintain persistence and pace for at least two hours at a time due to interruptions from psychologically-based symptoms. *Id.* He asked if the individual could perform any jobs. *Id.* The VE testified that the individual could perform no jobs in the national economy. *Id.*

### 2.    The ALJ's Findings

In his decision dated January 21, 2014, the ALJ made the following findings of fact and conclusions of law:

1.    Born on March 24, 1994, the claimant had not attained age 22 as of March 28, 2012, the date of his application for supplemental security income (20 CFR 404.102, 416.120(c)(4) and 404.350(a)(5)).

2.    The claimant has not engaged in substantial gainful activity since March 28, 2012, the date of his application for supplemental security income alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD), learning disorder, remote history of seizure disorder, and significantly subaverage intellectual functioning (20 CFR 404.1520(d) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He must never climb ladders, ropes or scaffolds, balance for safety on dangerous surfaces, drive or work around hazards such as unprotected heights and dangerous machinery and parts. He can understand, carry out, and remember simple, routine, repetitive tasks for 2 hours at a time; adapt to changes in a routine work setting if they are infrequent and gradually introduced; make simple work related decisions; occasionally interact with coworkers, supervisors, and the public but never work around crowds or in coordination with others; and perform production demands which consist of having assigned tasks to complete by the end of a workday or shift.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on March 24, 1994, and was a younger individual age 18–49, on the application dates (20 CFR 404.1563 and 416.963).

8.    The claimant has a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from the date of the application filed on March 28, 2012, through the date of this decision (20 CFR 404.350(a)(5), 404.1520(g) and 416.920(g).

Tr. at 12–24.

II.     Discussion

Plaintiff alleges the Commissioner erred in failing to adequately consider whether he was disabled under the provisions of Listing 12.05.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

Plaintiff argues the ALJ erred in finding that his impairments did not meet the provisions of Listing 12.05. [ECF No. 13 at 7–11]. He maintains the ALJ erred in determining that he had no deficits in adaptive functioning. *Id.* at 8. He contends the ALJ did not rely on substantial evidence to invalidate his IQ scores. *Id.* Plaintiff argues the ALJ made several erroneous factual findings that suggested he had greater functional abilities. *Id.* at 11. He maintains that the ALJ ignored evidence regarding his functional academic skills, communication skills, self-care abilities, social skills, and capabilities for employment. [ECF No. 16 at 5–8].

The Commissioner argues that substantial evidence supports the ALJ's determination that Plaintiff's impairment did not meet the requirements for a finding of disability under Listing 12.05. [ECF No. 15 at 11]. She maintains that the ALJ properly concluded that Plaintiff did not have deficits in adaptive functioning initially manifested

during the developmental period. *Id.* at 12. She contends the ALJ carefully considered the skill areas set forth in *Atkins v. Virginia*, 536 U.S. 304, 309 n. 3 (2002), and relied upon the expert testimony of Dr. Vonn to conclude that Plaintiff did not have adaptive functioning deficits that were consistent with intellectual disability. *Id.* at 13–19. She maintains the ALJ relied upon significant evidence of record and did not mischaracterize Plaintiff's functional abilities. *Id.* at 15–16. She argues that the ALJ's assessment of Plaintiff's IQ scores was appropriate and that, even if the ALJ had accepted the IQ scores of record, she still would have found that Plaintiff did not meet Listing 12.05 because he did not have deficits in adaptive functioning. *Id.* at 19–20.

To establish disability under Listing 12.05, an individual must show significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested before age 22 and meet the severity requirements in either paragraph "A," "B," "C," or "D." 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05. In *Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012)*,* the court explained that an individual must prove two elements to satisfy the requirements in the introductory paragraph to the Listing—"deficits in adaptive functioning generally" and a "deficiency" that "manifested itself before the age of 22."

"Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012), citing *Atkins*, 536 U.S. at 309 n.3. The Supreme Court has held that intellectual disability is characterized by

23

"significant limitations" in at least two of the areas of adaptive functioning in conjunction with significantly subaverage general intellectual functioning. *Atkins*, 536 U.S. at 309 n.3. In *Weedon v. Astrue*, No. 0:11-2971-DCN-PJG, 2013 WL 1315311, at *5–6 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013), this court identified the following factors that courts interpreting Listing 12.05 have deemed important for ALJs to consider in determining whether an individual has deficits in adaptive functioning: the individual's actual IQ score; the individual's diagnosis; whether the individual is illiterate; whether the individual has ever lived independently; whether the individual has ever provided care for others or whether he is dependent on others for care; school records and past academic performance; work history; and the tasks the individual is able to undertake.

Paragraph "A" of Listing 12.05 requires "mental incapacity evidenced by dependence on others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded." 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05A.

Paragraph "B" requires that the individual show a valid verbal, performance, or full scale IQ score of 59 or less. 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05B. "[A]n ALJ has the discretion to assess the validity of an IQ test and is not required to accept it even if it is the only such result in the record." *Hancock*, 667 F.3d at 474. However, if an ALJ rejects an IQ assessment, she should cite sufficient evidence to support her decision. *Cf. id.* at 475, citing *Lowery v. Sulliva*n, 979 F.2d 835, 837 (11th Cir. 1992) ("A valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is

inconsistent with other evidence in the record of the claimant's daily activities and behavior.").

To establish disability under paragraph "C," the individual must have "'a valid verbal, performance, or full scale IQ of 60 through 70' ('Prong 2'), as well as 'a physical or other mental impairment imposing an additional and significant work-related limitation of function' ('Prong 3')." *Hancock*, 667 F.3d at 473; 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05C. "Once it is established that the claimant's IQ falls within the range required by § 12.05C, the inquiry is whether the claimant suffers from any additional physical or mental impairment significantly limiting work-related functions." *Kennedy v. Heckler*, 739 F.2d 168, 172 (4th Cir. 1984); 20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05C.

To meet the requirements for a finding of disability under paragraph "D," the individual must have a valid verbal, performance, or full scale IQ of 60 through 70 that results in at least two of the following:

1.    Marked restriction of activities of daily living;

2.    Marked difficulties in maintaining social functioning;

3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation.

20 C.F.R., Pt. 404, Subpt. P, App'x. 1, § 12.05D.

The ALJ concluded that Plaintiff's mental impairments did not meet or medically equal the criteria of Listing 12.05 because Plaintiff did not demonstrate deficits in

adaptive functioning. Tr. at 15. She indicated the February 2006 administration of the VABS yielded low test results in communication skills, daily living skills, and socialization skills, but that the record inexplicably contained significantly higher scores on the VABS, as well. *Id.* She acknowledged that Plaintiff had significant limitations in the area of functional academic skills. Tr. at 16. She considered Plaintiff's communication skills and noted that Plaintiff was able to articulate effectively at the hearing and operate a cell phone. *Id.* She recognized that Plaintiff had some problems making friends and cooperating with others and showed some aggressiveness, but stated this was influenced by peer pressure. *Id.* She considered Plaintiff's self-care and home living skills and concluded that Plaintiff was able to care for his own hygiene and had daily living skills that were commensurate with those of his peers. *Id.* In assessing Plaintiff's social skills, the ALJ noted that Plaintiff had some behavioral problems in school, but that these behaviors were influenced by peer pressure and that Plaintiff was able to spend time with family, participate in JROTC, and serve as a member of the football team. *Id.* In examining Plaintiff's use of community resources, the ALJ again noted that Plaintiff had participated in JROTC and as a member of the football team and was able to take a school bus without accompaniment. *Id.* She found that Plaintiff was capable of self-direction because he had daily living skills commensurate with those of his same aged peers and was able to bathe, dress, use the computer and microwave, and stay home alone after school. *Id.* She acknowledged that Plaintiff had no work history, but noted that his IEP indicated he worked better with hands on skills and crafts and expressed interest in working as a carpenter with a construction crew. Tr. at 17. In

examining Plaintiff's ability to engage in leisure, the ALJ noted that Plaintiff played video games, used a computer, participated in JROTC, and was a member of the football team. *Id.* She indicated the record generally indicated Plaintiff's health was good and that he had no treatment for seizures since 2002. *Id.* She concluded that Plaintiff was able to avoid hazards and dangerous settings because he rode a school bus, participated in JROTC, was a member of the football team, and planned to work as a carpenter on a construction crew. *Id.* Finally, the ALJ indicated she gave great weight to Dr. Von's opinion in concluding that Plaintiff did not have deficits in adaptive functioning that were consistent with a finding of intellectual disability. *Id.*

The ALJ found that Plaintiff did not meet the requirements of paragraph "A" of Listing 12.05 because Plaintiff could feed, dress, and bathe himself and prepare simple meals. Tr. at 15. She noted that Plaintiff's teacher described him as dressing well and having "excellent" personal hygiene. *Id.*

In discussing Plaintiff's IQ as it pertained to paragraphs "B," "C," and "D," the ALJ noted that the evidence showed Plaintiff to have a history of IQ scores in the 50s and 60s. Tr. at 15.

The ALJ concluded that Plaintiff's mental impairments did not meet the paragraph "D" criteria because they did not cause at least two marked limitations or one marked limitation and repeated episodes of decompensation, each of extended duration. Tr. at 13. She found that Plaintiff had moderate limitations in activities of daily living because he was able to attend to his personal hygiene, make a sandwich, use a cell phone, and participate in JROTC. *Id.* She determined Plaintiff had moderate limitations in social

27

functioning because he played video games, spent time with his dog and cat, and watched television. Tr. at 13–14. She noted that Plaintiff was "a discipline problem on the bus and was disrespectful to adults," but was a member of the football team. Tr. at 14. She assessed Plaintiff's limitations in concentration, persistence, or pace as moderate. *Id.* She noted that Plaintiff put forth minimal effort during the psychological evaluation and that the cognitive and academic testing was not an accurate measure of his skills. *Id.* She observed that Plaintiff could operate a cell phone and video games and participated in and earned good grades in JROTC and building construction. *Id.*

The ALJ addressed Plaintiff's adaptive functioning in the areas of communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety and concluded that Plaintiff did not have deficits in adaptive functioning because he only had significant limitations in the area of functional academic skills. *See* Tr. at 15–17. She recited the evidence that supported a finding that Plaintiff had significant limitations in several areas, but also cited evidence that showed functional abilities. Although it is not the role of the court to reweigh conflicting evidence, it is appropriate for the court to remand the case to the Commissioner where the ALJ does not adequately explain the reasons for the weight she accorded to the evidence. *See Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013). Upon review, it appears that the ALJ failed to adequately explain her reasons for concluding that Plaintiff had no significant deficits in adaptive functioning.

In considering Plaintiff's social skills, the ALJ recognized that Plaintiff engaged in inappropriate behavior at school and while on the school bus, used profane language, was

disrespectful, used a cell phone in class, and possessed a weapon at school, but also noted that peer pressure played a role in his behavior and that he was a member of the football team and participated in JROTC. Tr. at 16. The ALJ's summary of the evidence lacks a logical bridge to her conclusion that Plaintiff lacks significant limitations in his social skills. An individual's participation in JROTC and football does not mean that his problems respecting adults in authority and his threats of violence to others have no significant impact on his social and interactive skills. *See id*. Furthermore, Plaintiff's inability to make appropriate choices when presented with peer pressure suggests greater limitations in his social skills. Despite finding that Plaintiff had no significant limitations in his social skills, the ALJ limited Plaintiff to only occasional interaction with coworkers, supervisors, and the public and found that Plaintiff could never work around crowds or in coordination with others. Tr. at 18. Her assessment of functional restrictions pertaining to Plaintiff's social skills is incongruous with her conclusion that Plaintiff had no significant limitations in the social skills component of adaptive functioning.

In discussing Plaintiff's adaptive functioning with regard to safety, the ALJ concluded that Plaintiff was capable of avoiding hazards and dangerous settings based on his participation in JROTC and football and his vocational plan to obtain a job on a construction crew. Tr. at 17. However, in assessing Plaintiff's RFC, the ALJ found that Plaintiff "must never climb ladders, ropes, or scaffolds, balance for safety on dangerous surfaces, drive or work around hazards such as unprotected heights and dangerous machinery and parts." Tr. at 17–18. The ALJ's inclusion of limitations in the RFC

pertaining to Plaintiff's safety is incompatible with her finding that Plaintiff had no significant limitations in the safety component of adaptive functioning.

The ALJ's conclusion that Plaintiff lacked deficits in adaptive functioning also fails to reflect adequate consideration of several factors that this court has previously identified as important to the inquiry. *See Weedon*, 2013 WL 1315311, at *5–6. Plaintiff's actual IQ scores were consistently below 70, and he was functioning on a first to second grade level in reading, writing, and math as a twelfth grade student. *See* Tr. at 295, 335, 338; *see also Rivers v. Astrue*, No. 8:10-314-RMG, 2011 WL 2581447, at *3 (D.S.C. Jun. 28, 2011) (reversing the Commissioner's finding that Plaintiff had no deficits in adaptive functioning where the plaintiff was functionally illiterate, showed poor academic performance with multiple IQ tests in or before third grade showing scores in the 50s, and dropped out of school in the ninth grade). The record reflects that Plaintiff has never lived alone or provided care for others and is dependent on his mother for care. *See* Tr. at 37 (Plaintiff testified he had never lived alone), 39 (Plaintiff testified his mother drove him to places, purchased his clothing, and administered his medications), 51 (Ms. Dollard testified Plaintiff could prepare a peanut butter and jelly sandwich, but could not use the stove or microwave), 250 (Ms. Dollard reported she woke Plaintiff each morning, administered his medications, and waited with him for his bus to arrive), 266 (Ms. Dollard indicated Plaintiff could not administer his own medications or prepare meals), 267 (Ms. Dollard reported Plaintiff was incapable of handling money or paying bills), 390 (Ms. Dollard reported to Dr. Ritz that she had to remind Plaintiff to engage in personal grooming); *see also Weedon*, 2013 WL 1315311,

at *6, citing *Salmons v. Astrue*, No. 5:10-195-RLV, 2012 WL 1884485, at *5 (W.D.N.C. May 23, 2012) (noting claimant was heavily dependent on his mother and was not responsible for the care or supervision of anyone else); *Holsclaw v. Astrue*, No. 1:10-199, 2011 WL 6935499, at *4 (W.D.N.C. Dec. 30, 2011) (noting claimant had never lived independently and required a parent's help). The record also reflects that Ms. Mason diagnosed Plaintiff with mild mental disability[5], and this court has indicated that such a diagnosis is consistent with a finding that the individual has deficits in at least two areas of adaptive functioning. *See Cagle v. Astrue*, 9:09-3250-RMG, 2011 WL 322554, at *3 (D.S.C. Jan. 28, 2011) (holding that the ALJ erred in determining the plaintiff had no deficits in adaptive functioning where he was diagnosed with "mild mental retardation" and the *DSM-IV* defines "mental retardation" as "significantly subaverage general intellectual functioning . . . that is accompanied by significant limitations in adaptive functioning in at least two skill areas . . .").

To the extent that the Commissioner may argue that the ALJ's failure to adequately address Plaintiff's deficits in adaptive functioning was rendered harmless by her finding that Plaintiff failed to meet the criteria in paragraphs "A," "B," "C," and "D," the undersigned finds this argument unavailing. The ALJ acknowledged that the evidence

---

[5] Although Ms. Mason diagnosed "mild mental disability" as opposed to "mild mental retardation," the undersigned notes that the terms are used interchangeably. The impairment classified as "mental retardation" in the *Diagnostic & Statistical Manual of Mental Disorders, Fourth Edition* ("DSM-IV") was reclassified as "intellectual disability" in the DSM-5. The SSA similarly changed the impairment in the Listings from "mental retardation" to "intellectual disability" through a final rule effective on September 3, 2013. Change in Terminology: "Mental Retardation" to "Intellectual Disability," 78 FR 46499 (Aug. 1, 2013) (codified at 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 12.05).

documented IQ scores below 70. Tr. at 15. In fact, the record contained several IQ scores

of 60 or less. *See* Tr. at 335 (indicating that January 2003 testing revealed Plaintiff to

have a verbal IQ of 59 and a full scale IQ of 56), 338 (indicating a full scale IQ of 53 and

a PRI[6] score of 47). While the ALJ noted that the May 25, 2012, cognitive and academic

testing was determined to be an inaccurate assessment of Plaintiff's skills and that the

2006 testing indicated full scale IQ scores of both 53 and 63, she did not refute the

accuracy of the 2003 IQ scores or the February 2006 PRI score. *See* Tr. at 15. Because

the ALJ failed to cite substantial evidence to refute the IQ scores of record, the evidence

suggests that Plaintiff's IQ score met the severity requirement in paragraph "B" of

Listing 12.05. The ALJ also found that Plaintiff had several severe impairments in

addition to significantly subaverage intellectual functioning, including ADHD, a learning

disorder, and a remote history of seizure disorder. Tr. at 12. The ALJ's recognition of

these additional impairments suggests a finding that Plaintiff had an additional physical

---

[6] The IQ measures in Listing 12.05 refer to scores on the third edition of the Wechsler
Adult Intelligence Scale ("WAIS-III"), but the fourth edition of the test ("WAIS-IV")
does not give verbal and performance IQ scores. Catherine M. Callery & Louise M.
Tarantino, *Which WAIS Was It?*, EMPIRE JUSTICE CENTER (Nov. 16, 2009),
http://www.empirejustice.org/issue-areas/disability-benefits/ssi-ssd/ssa-issues/which-
wais-was-it.html. "The terms Verbal IQ (VIQ) and Performance IQ (PIQ) have been
replaced with the terms Verbal Comprehension Index (VCI) and Perceptual Reasoning
Index (PRI) respectively. According to the WAIS-IV technical manual, "[t]he terms VCI
and PRI should be substituted for the terms VIQ and PIQ in clinical decision-making and
other situations where the VIQ and PIQ were previously used. The VCI is composed of
subtests measuring verbal abilities that require reasoning, comprehension, and
conceptualization, and the PRI is composed of subtests measuring nonverbal reasoning
and perceptual organization. *Id.*, citing *WAIS-IV Administration and Test Scoring Manual*
at 5.

32

or mental impairment that significantly limited his work-related functions, as required by paragraph "C" of Listing 12.05.

In light of the foregoing, the undersigned recommends the court find the ALJ did not cite substantial evidence to support her finding that Plaintiff's impairments failed to meet the requirements of Listing 12.05.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

March 2, 2016                                    Shiva V. Hodges
Columbia, South Carolina                         United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).